**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-42 (DLF)** |
| **MARCUS DAVID SMITH** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Marcus David Smith to 24 months of incarceration, thirty-six months of supervised release, $21,191 in restitution, and a $230 special assessment.

### I.      INTRODUCTION

The defendant, Marcus David Smith, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Smith, a home remodeler from Fleming Island, Florida, passed through the riot on the West Front of the Capitol to the Northwest Courtyard in the Upper West Terrace. In the Northwest Courtyard, Smith witnessed the signs of a riot unfolding around him, including other rioters climbing the building and smashing windows, as well as the presence of chemical irritants in the confined space of the courtyard. At 2:42 p.m., Smith stood near the base of a short flight of stairs that led up to a door known as the Senate Parliamentarian Door or Senate Fire Door. That door, which faces south and lacks an exterior handle, is intended solely as an emergency exit. The Brumidi Corridor is inside this door. While Smith watched, another rioter used a metal cane to smash through the windows on the Senate Parliamentarian Door and opened it from the inside. He continued watching as three to four rioters fought a group of United States Capitol Police ("USCP") officers to gain access to the building. Over the course of several minutes, Smith saw rioters enter the building through the door before he too bounded up the steps and entered the building through the Senate Parliamentarian Door. Using a flag to cover his face against the chemical irritants in the Brumidi Corridor, Smith held his phone over his head and walked into the corridor before confronting a congested group of rioters who were being held back by police officers. Smith then turned around and joined a group of four rioters who were ramming their bodies against an interior door in a synchronized motion. Smith pushed four times against the door with these rioters before the wood of the door shattered and the rioters flooded into the room on the other side. The door that Smith broke down was more than 150 years old and was part of the original construction of the Senate Wing of the Capitol. Smith remained in the room for approximately four minutes before exiting back into the Brumidi Corridor and attempting to walk further into the Capitol. He was turned around by Capitol Police and forced with the other rioters

from the building. The repairs to the door that Smith broke down cost $21,191 to replace. The government recommends that the Court sentence Smith to 24 months of incarceration, which is the midpoint of his guidelines range.

## II.    FACTUAL BACKGROUND

### A.  Smith's Role in the January 6, 2021, Attack on the Capitol

*Smith's Early Morning Activities and Breach of the Northwest Courtyard*

Marcus Smith travelled with other individuals by car to Washington, D.C., from his home in Fleming Island, Florida. On the morning of January 6, 2021, Smith attended the "Stop the Steal" rally. Smith posed for a photo with his travelling companions on the National Mall near the Washington Monument, which was later uploaded to Facebook. *See* Figure 1. Smith was dressed in a black, all-weather jacket, blue jeans, and a red hat. He was also carrying a backpack and a blue Trump-branded flag. At the time that he posed for this photograph, Smith was not wearing gloves.



*Figure 1.*

Smith attended then-President Trump's was speech at the Ellipse. *See* Gov. Ex. 402 at 1:44-2:24. In his speech, the President described the process that was taking place at the Capitol that day and Vice President Mike Pence's role in it. *See* Gov. Ex. 503. Following the president's speech, Smith walked to the Capitol.

On January 6, 2021, the Capitol grounds were closed to the public because of the joint session to certify the results of the 2020 presidential election. The closed area, *see* Gov. Ex. 102, was marked with signs announcing the closure, *see* Gov. Ex. 103 and 105, as well as with bike racks and snowing fencing, *see* Gov. Ex 106 and 107. As Smith made his approach to the closed West Front of the Capitol, a series of events happened there in rapid succession. At just before 1:00 p.m., rioters at the Peace Circle breached the restricted perimeter and quickly overran the West Lawn and West Plaza. *See* Gov. Ex. 112 at 0:00-0:24. Shortly after 1:00 p.m., MPD officers were called to the Capitol to assist the overwhelmed Capitol Police. Starting at approximately 1:12 p.m., MPD and USCP officers established a line of bike racks in the West Plaza to separate the swelling mob from the Capitol. *Id.* at 0:26-0:51. By 1:29 p.m., this line extended the length of the plaza. *Id.* Officers stood on the opposite side of the barricades to try to prevent rioters from advancing. *Id.* The rioters were undeterred, and many began to assault police to try to overrun the police line. *Id.* at 0:51-1:53. At 1:48 p.m., rioters overwhelmed a small group of officers at the base of the Northwest Steps and, between 2:08 p.m. and 2:11 p.m., had broken through the remaining police lines on the Northwest Steps to gain access to the Upper West Terrace. Rioters then breached the building by breaking through the Senate Wing Door at 2:13 p.m.

While these events were unfolding outside the building, the lawmakers and staff inside the Capitol, including Vice President Pence, were beginning the process of certifying the results of the

2020 presidential election. *See* Gov. Ex. 116 at 0:00-5:24. When the rioters breached the Senate

Wing Door, the Senate went into recess, *id.* at 5:24-5:45, followed shortly by the House, *id.* at

5:45-7:42. Following the security breach at the Senate Wing Door, the Vice President had to be

relocated to a secure location. *See* Gov. Ex. 203; *see also* Gov. Ex. 205, 206, and 207.

Smith arrived on Capitol grounds some time before 2:30 p.m. By the time he climbed up

to the Northwest Courtyard on the Upper West Terrace, he had to walk through an active riot. At

2:31 p.m., Smith stood there as the riot raged around him. *See* Figure 2; *see also* Gov. Ex. 403 at

1:08-END. Sometime between leaving the area around the Washington Monument and his ascent

to the Upper West Terrace, Smith donned a pair of black, padded tactical gloves. Unlike gloves

designed to protect against cold temperatures, a tactical glove is not particularly warm but has

protection over the knuckles and is made of more durable material that is intended to protect

against cuts or abrasions. *See* Trial Tr., 9/27/2024 at 83:23-84:20.



*Figure 2.*

While there, Smith hoisted himself up on to a ramp that had been constructed for the upcoming inauguration. *See* Gov. Ex. 406 at 1:55-2:17; Gov. Ex. 406 at 0:18-1:04; *see also* Figures 3 and 4. From this elevated vantage point, Smith had an overhead view of the riot. *Id.*; *see also* Gov. Ex. 108 at 5-7. As Smith was above the crowd, a cloud of chemical irritants wafted around the Senate Wing Door, which was immediately behind him. *See* Gov. Ex. 406 at 1:55-2:17; Gov. Ex. 406 at 0:18-1:04; *see also* Figures 3 and 4. While Smith was in the Courtyard, a person in the Courtyard commented that he felt the effects of the chemical irritants in the air. *See* Gov. Ex. 408.



*Figure 3.*                    *Figure 4.*

*Breach of the Parliamentarian Door*

At 2:41 p.m., a rioter began using the handle of a metal cane to strike the windows on the Parliamentarian Door. *See* Gov. Ex. 302 at 1:10-1:22; *see also* Gov. Ex. 409. After several strikes, the rioter broke the glass pane to the door. Gov. Ex. 302 at 2:00-2:10. He reached inside and opened the door using the interior latch. *Id.* That rioter and others who were behind him then fought with the Capitol Officers who were attempting to prevent them from entering the building through the

now-breached door. *Id.* at 2:10-2:26; *see also* Gov. Ex. 410 at 0:00-0:10. From a short distance

away from the base of the steps leading to the Parliamentarian Door, Smith, holding his phone

aloft over his head to record the scene, watched as rioters smashed the windows, opened the door,

and fought with police to enter the building. *See* Gov. Ex. 413 at 0:09-0:41; *see also* Figure 5.



*Figure 5.*

After watching rioters breach the Senate Parliamentarian Door, Smith skipped up the steps to the

Parliamentarian Door. *See* Gov. Ex. 408 at 0:17-0:21; *see also* Figure 6.



*Figure 6.*

Covering his face with his Trump flag to protect against the chemical irritants in the corridor, Smith entered the Brumidi Corridor at 2:44 p.m. *See* Gov. Ex. 301 at 4:00-4:30; *see also* Figure 7. As he walked through the Parliamentarian Door, he walked past a blaring door alarm and over broken pieces of glass from the shattered exterior windows. *See* Gov. Ex. 407 at 8:34-8:44.



*Figure 7.*
*Smith Breaks Down the Door to S-131*

Inside the Brumidi Corridor, Smith walked north with the crowd of rioters. As he moved, he swung his phone to his right towards the Senate Parliamentarian's Office, which rioters were ransacking. *See* Gov. Ex. 301 at 4:11-4:19. To Smith's left as he entered the Brumidi Corridor was the door to S-131. *Id.* A rioter was outside the door to S-131 repeatedly throwing his shoulder into the door in an attempt to open it. Smith initially walked past this rioter who was attempting to break down the door. *Id.* at 4:15-4:25. Smith then joined a mass of rioters who were being held back by a line of Capitol Police officers. *Id.* During this time, three other rioters joined in the efforts to break down the door to S-131. *Id.* at 4:26-4:44.

8

Finding his way blocked by the crowd and the Capitol Police, Smith turned around joined the rioters throwing themselves against the door to S-131. *See* Gov. Ex. 301 at 4:43-4:49. Smith and the others threw themselves into the door five times; on the fifth blow, the wood framing to the door splintered and broke open. *Id.* at 4:45-4:54; *see also* Gov. Ex. 418 at 0:10-0:17 (the door can be heard splintering at 0:12-0:13); *see also* Figures 8-10.



*Figure 8.*



*Figure 9.*



*Figure 10.*

Smith's actions enabled the mob to surround the Capitol Police officers in the Brumidi Corridor. As a result of breaking down this door and the layout of the offices in this corridor, the rioters were now able to now outflank and bypass the officers holding the crowd back in the corridor. *See* Trial Tr., 9/26/2024 at 211-213. By destroying the door, Smith and the four other rioters exposed the officers inside the Brumidi Corridor to being overrun and assaulted from the rear. *Id.* These officers, already numerically overwhelmed, had to divert their extremely limited manpower to clear the offices that Smith had helped open to the mob. *Id.* at 211.

After breaking down the door, Smith went into the S-131 office space for approximately two minutes. *See* Gov. Ex. 301 at 4:55-7:35. After he exited the office, Smith walked across the hallway to look inside the ransacked Parliamentarian's Office. *Id.* at 7:36-7:44. He then turned left up the hallway, glanced downward as he stepped over the remnants of a shattered window, and tried to move further into the Capitol through the Brumidi Corridor. *Id.* at 7:44-8:08. Officers at the north end of the corridor were able to establish limited control and subsequently forced the rioters, including Smith, from the building. *See id.* at 9:10-10:12; *see also* Figure 11.

10



*Figure 11.*

As he walked back towards the Parliamentarian Door, Smith tried to lead the mob in a cheer and held up his fist to the air in a celebratory gesture. *See* Gov. Ex. 301 at 9:36-9:43. He also smiled and laughed with the other rioters in the Brumidi Corridor as they neared the threshold of the Parliamentarian Door. *Id.* at 9:57-10:01. Smith exited the Capitol at just after 2:50 p.m. *Id.* Smith was inside the Capitol for six minutes.

### *The Door & Its Repair*

The door that Smith broke down was 171 years old, dating back to the original construction of the Senate Wing of the Capitol in 1853. In August 1814, during the War of 1812, the British Army burned much of Washington, D.C., including the Capitol, during an event known as the "Burning of Washington."[2] When the Capitol was being expanded following the war, the architects and engineers who were responsible for the construction of the new wings of the building decided to use what were known as "fireproof materials." Trial Tr., 9/26/2024 at 174. In the 1850s,

---

[2] Until January 6, 2021, this event was the only time in the history of the United States that the seat of government came under direct assault.

this meant using a cast iron frame to secure the door and mahogany, an extremely hard wood that ignites at high temperatures, for the door itself. *Id.* The wood that the door was made of was old-growth mahogany. *Id.* at 175, 181. Because mahogany has been extensively over-logged worldwide over the past 175 years, old-growth mahogany is no longer generally available for purchase. *Id.* at 181.

The Architect of the Capitol assessed the damage to the door to S-131, along with ten other doors in the Senate Wing of the Building, to be so extensive that they were no longer capable of closing, latching, or locking, which presented a security concerns. *Id.* at 177. The door to S-131 was temporarily fixed for the upcoming inauguration but required additional repairs. *Id.* at 178. Ultimately, the Architect of the Capitol concluded that the door would need to be replaced so that it could close, lock, and latch. *Id.* at 180. To preserve the historic nature of the building, the Senate Wing, and the Brumidi Corridor, the door needed to be replaced using old-growth mahogany. *Id.* at 181. By good fortune, the United States Forest Service had a stockpile of old-growth mahogany that they donated to the restoration of the Capitol following the riot. *Id.*; *see also* Amy Androff, *Legacy Lumber from WWI Research Helps to Repair the U.S. Capitol Building*, U.S. Forest Service, January 6, 2023 (*available at* https://research.fs.usda.gov/fpl/news/featured/legacy-lumber-wwi-research-helps-repair-u.s.-capitol-building). The crafts and tradespeople employed by the Capitol spent dozens of hours constructing a new door to S-131. *Id.* at 183-186. In the end, adding together the cost of the retail value of old growth mahogany and the labor required to construct an entirely new door, it cost $21,191 to repair the damage Marcus Smith did when he broke down this door. *Id.* at 192.

*Smith's Interview with the FBI*

On September 2, 2021, FBI agents interviewed Marcus Smith outside of his home in Florida. Smith was not in custody during the interview. During the interview, Smith confirmed that he was present in Washington for the then-president's rally. Smith claimed that he went to Washington to "witness history and have [his] voice heard." However, at that point Smith began to mislead the agents about his conduct. Smith claimed that he had been "waved" into the Capitol by law enforcement and that he was "unaware he was breaking the law" when he entered the building. Smith claimed that, inside the building, he stopped an unknown person from breaking a television. He claimed that he only realized he was in a restricted area once he encountered a line of police officers and at that point turned around to try to leave. Smith also added that he helped other unknown people open a door that may have been partially broken or ajar and that he believed some other people may have been on the other side of that door. Smith then stated that he no longer had any of the photos or videos that he took at the Capitol because he had deleted them and gotten a new phone in the intervening months. Smith identified himself in three screenshots taken from Capitol surveillance, one of which showed him breaking down the door.

## III.    THE CHARGES AND TRIAL

On January 24, 2024, a federal grand jury returned an indictment charging Smith with seven counts, including, 18 U.S.C. § 1361, 2 (Destruction of Government Property and Aiding and Abetting, 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(4) (Engaging in Physical Violence in a Restricted Building or Grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building), 40 U.S.C. § 5104(e)(2)(F)

(Act of Physical Violence in the Capitol Ground or Buildings), and 40 U.S.C. § 5104(e)(2)(G)

(Parading, Demonstrating, or Picketing in a Capitol Building). Trial commenced on September 24,

2024, and, on, September 30, 2024, the jury convicted Smith of all counts on the indictment.

## IV.   STATUTORY PENALTIES

Smith now faces sentencing on all the counts of the indictment. The statutory penalties are:

- Count One – 18 U.S.C. § 1361, 2 (Destruction of Government Property and Aiding and Abetting): 10 years imprisonment, thirty-six months supervised release, and a $250,000 fine;
- Count Two – 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds): 1 year imprisonment, twelve months supervised release, and a $100,000 fine;
- Count Three – 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds): 1 year imprisonment, twelve months supervised release, and a $100,000 fine;
- Count Four – 18 U.S.C. § 1752(a)(4) (Engaging in Physical Violence in a Restricted Building or Grounds): 1 year imprisonment, twelve months supervised release, and a $100,000 fine;
- Count Five – 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building): six months imprisonment and a $5,000 fine;
- Count Six – 40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence in the Capitol Ground or Buildings): six months imprisonment and a $5,000 fine; and
- Count Seven – 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building): six months imprisonment and a $5,000 fine.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). That Guidelines analysis is as follows:

Count One: 18 U.S.C. § 1361 – Destruction of Government Property Exceeding $1,000

| Base Offense Level: | 6 | § 2B1.1(a)(2) |
|---|---|---|
| Specific Offense Characteristic (Value | +4 | U.S.S.G. § 2B1.1(b)(1)(C): "If the loss exceeded [$15,000], |

| of Loss) | | increase" the offense level by 4. |
|---|---|---|
| *Cross Reference* | | U.S.S.G. § 2B1.1(c)(4): Cross Reference to U.S.S.G. § 2B1.5 for "Damage to, or Destruction of, Cultural Heritage Resource." *See analysis below.* |
| Base Offense Level | 8 | U.S.S.G. § 2B1.5(a). |
| Specific Offense Characteristic (Value of Loss) | +4 | U.S.S.G. §2B1.5(b)(1): "If the value of the cultural heritage resource or paleontological resource […] (B) exceeded $6,500, increase by the number of levels from the table in § 2B1.1 […] corresponding to that amount." U.S.S.G. § 2B1.1(b)(1)(C): "If the loss exceeded [$15,000], increase" the offense level by 4. |
| Specific Offense Characteristics (National Historic Landmark) | +2 | U.S.S.G. § 2B1.5(b)(2)(B): "If the offense involved a cultural heritage resource or paleontological resource from, or that, prior to the offense, was on, in, or in the custody of […] (B) a National Historic Landmark […] increase by two levels." [3] |
| Total | 14 | |

*The Cross Reference for Damage to a Cultural Heritage Resource Applies*

The cross reference in § 2B1.1(c)(4) should apply because "the offense involved a cultural

---

[3] Application Note 3(C) for U.S.S.G. § 2B1.5, defines a National Historic Landmark as "a property designated as such pursuant to 54 U.S.C. § 302102." Section 302102(a) states that "[a] property that meets the criteria for National Historic Landmarks established *pursuant to section 302103* of this title shall be designated as a National Historic Landmark and included on the National Register, subject to the requirements of section 302107 of this title." 54 U.S.C. § 302102(a) (emphasis added). While, as noted above, the Capitol is exempt from inclusion on the National Register and other regulations in 54 U.S.C. § 300101 et. seq., Section 302103(2)(B) gives the Secretary of the Interior the authority to designate and remove the designation of National Historic Landmarks. 54 U.S.C. § 302103(2)(B); 36 C.F.R. § 65.9 (discussing withdrawal of National Historic Landmark designation by the Secretary of the Interior). The Capitol was designated as a National Historic Landmark in December 1960, and the National Park Service (on the Secretary of the Interior's behalf) continues to recognize that designation to this day. *See* List of NHLs by State - National Historic Landmarks (U.S. National Park Service) (nps.gov), https://www.nps.gov/subjects/nationalhistoriclandmarks/list-of-nhls-by-state.htm (last visited December 19, 2024) (listing the United States Capitol as a National Historic Landmark and noting its December 1960 designation date); *see also* 36 CFR § 65.1(c) ("The National Park Service (NPS) administers the National Historic Landmarks Program on behalf of the Secretary").

heritage resource." U.S.S.G. § 2B1.1(c)(4). As noted in the PSR, Smith worked collectively with other rioters to break open a door of the U.S. Capitol Building, specifically a closed door leading to Room S-131. PSR at ¶ 11. According to the testimony of a witness from the Office of the Architect of the Capitol, that door of the Capitol ultimately had to be replaced, costing $21,191.

The U.S. Capitol is a "historic property" and accordingly a cultural heritage resource, pursuant to Application Note 1(A)(i) for U.S.S.G. §2B1.5. The Application note refers to 54 U.S.C. § 300308, which defines a "historic property" as "any prehistoric or historic district, site, building, structure, or object *included on, or eligible for inclusion on, the National Register [of Historic Places]*…" 54 U.S.C. § 300308 (emphasis added). While the United States Capitol is not included on the National Register, as it is exempt from inclusion on the National Register and other attendant regulations in 54 U.S.C. § 300101 et. seq. pursuant to 54 U.S.C. § 307104, it would otherwise be *eligible for inclusion* on the National Register. The United States Capitol was designated as a National Historic Landmark in December 1960 and the National Park Service continues to recognize that designation to this day.[4] National Historic Landmarks are otherwise automatically included on the National Register pursuant to 54 U.S.C. § 302102(a). Accordingly, the United States Capitol is a historic property and cultural heritage resource, and Section 2B1.5 should be applied. Furthermore, 2B1.5 has been applied in multiple cases where rioters damaged parts of the Capitol Building. *See, e.g.*, *United States v. Rodean*, 21-cr-57 (TNM), ECF 77, Sent.

---

[4] *See* List of NHLs by State - National Historic Landmarks (U.S. National Park Service) (nps.gov), *available at* https://www.nps.gov/subjects/nationalhistoriclandmarks/list-of-nhls-by-state.htm (last visited December 19, 2024) (listing the United States Capitol as a National Historic Landmark and noting its December 1960 designation date); *see also* 36 CFR § 65.1(c) ("The National Park Service (NPS) administers the National Historic Landmarks Program on behalf of the Secretary").

Tr. at 10 (noting that the court "agree[d] with [the government] on that point, on the cultural heritage point."); *United States v. Pezzola*, 21-cr-175-6 (TJK), Sent. Tr. at 37 ("As a technical matter, the PSR, I thought, properly, under Count 7, added a -- under 2B1.5, because the Senate wing window was a cultural heritage resource").[5]

Finally, the cross reference also applies because "the resulting offense level [under § 2B1.5] is greater than that determined above [under § 2B1.1]." U.S.S.G. § 2B1.1(c)(4). As explained below, the offense level under 2B1.1 would be 10 and the offense level under 2B1.5 would be 14, making the offense level under 2B1.5 greater than that under § 2B1.1, and accordingly making the 2B1.5 guideline applicable.

Here, Smith was found guilty of willingly damaging a historic door inside the U.S. Capitol. The cross reference in § 2B1.1(c)(4), and ultimately § 2B1.5, appropriately applies for this sentencing on 18 U.S.C. § 1361.

<u>Count Two:</u> 18 U.S.C. § 1752(a)(1) – Entering and Remaining in a Restricted Building or Grounds

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Guidelines direct that if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. See §1B1.2 n.1. Here, since Section 1752(a)(1) is essentially a

---

[5] Sometimes § 2B1.1 still applies regardless of whether or not a court finds the Capitol to be a cultural heritage resource, because the offense level calculated under § 2B1.1 is greater than or equal to the offense level calculated under § 2B1.5. *See, e.g., United States v. Bozell*, 21-cr-216 (JDB), Sent. Tr. at 9 ("Because it is a dangerous weapon and that adjustment applies, then Mr. Bozell's offense level under 2B1.1 jumps up to 14, the same level that it is under 2B1.5, a level 14. Therefore, the default provision governs and 2B1.1 controls. You don't get to 2B1.5 because the offense level under 2B1.5 is not greater than that determined under 2B1.1."). Additionally, although 2B1.1 was applied to one rioter—Isaiah Farnsworth, 23-cr-00004 (APM)—who was also convicted of 18 U.S.C. § 1361 for his role in breaking down the doors to S-131, Farnsworth was convicted by plea agreement, which included a provision that the parties agreed that the appropriate guideline for that count would be § 2B1.1. Here, in the absence of any agreement, the Government believes that Section 2B1.5 more accurately reflects Smith's conduct and the nature of the Capitol Building.

trespass statute, the most applicable guideline is § 2B2.3 (Trespass).

| Base Offense Level: | 4 | §2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic (Restricted Grounds) | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted buildings or grounds." On January 6, 2021, the U.S. Capitol and its grounds were restricted because protectees of the United States Secret Service were visiting.  *See* 18 U.S.C. § 1752(c)(1)(B). |
| *Cross Reference* | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above." <br><br> U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> Smith entered and remained in the restricted area of the Capitol complex for the purpose of committing a felony, that being the destruction of the door to S-131, in violation of 18 U.S.C. § 1361. The base offense level for the Section 1361 offense should be applied—here, U.S.S.G. § 2A2.2 – as well as any adjustments from § 2A2.2 Guideline for any intended offense conduct. |
| Base Offense Level (adjusted) | 8 (from Count 3) | U.S.S.G. §2B1.5 (a) |
| Total | 8 | |

Count Three: 18 U.S.C. § 1752(a)(2) – Disorderly and Disruptive Conduct in a Restricted Building or Grounds

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Guidelines direct that if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. See §1B1.2 n.1. Here, because Section 1752(a)(2) involves behavior beyond mere trespass, the most applicable guideline is § 2A2.4 (Obstructing or Impeding Officers). *See United States v. Nassif*, 97 F.4th 968, 983 (D.C. Cir. 2024) ("But section 2B2.3 is a mismatch for the section 1752(a)(2) violation charged in Count Two…Section 2A2.4 is a more natural fit.").

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Total | 10 | |

Count Four: 18 U.S.C. § 1752(a)(4) – Engaging in Physical Violence in a Restricted Building or Grounds

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Total | 10 | |

Counts Five, Six, and Seven: 40 U.S.C. § 5104(e)(2)(D), (F), and (G) – The United States Sentencing Guidelines do not apply to these Class B misdemeanors. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

Under U.S.S.G. §3D1.2, "closely related counts" group.  Accordingly, Smith's offenses form two groups. Counts One and Four form the first group because they have the same victim, the Architect of the Capitol, and two or more acts or transactions connected by a common criminal objective. Counts Two and Three form the second group because they have the same victim, Congress, and two or more acts or transactions connected by a common criminal objective. Pursuant to U.S.S.G. §3D1.4, one unit is assigned to each group. Smith's combined adjusted offense level is therefore 16.

### U.S.S.G. § 4C1.1 Does Not Apply

Section 4C1.1 does not apply in this case, for the following reasons. First, Smith's criminal history score is one and therefore the zero-point offender adjustment does not apply to him. *See* U.S.S.G. § 4C1.1(1). Second, Smith's offense also involved violence. U.S.S.G. § 4C1.1(3). Smith joined a mob that broke down a 171-year-old door inside of a secured government building. As a result of his actions, officers who were protecting the Brumidi Corridor were at risk of being outflanked by the mob. In the context of a violent riot, his offense both involved violence and the credible threat of violence. *See United States v. Bauer*, 21-cr-386-2 (TNM), ECF 195 at 4-5 (defining "violence" as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to

harm."); *see also United States v. Hernandez*, 21-cr-445 (CKK), ECF 65 at 5 (adopting definition of violence from *Bauer*); *see also United States v. Andrulonis*, 23-cr-085 (BAH), Sent. Tr. at 11-12 ("In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction."); *United States v. Dova Winegart*, 22-cr-301 (CJN), Sent. Hear'g. 12/9/2024 (finding that breaking a window is "violence" for purposes of U.S.S.G. § 4C1.1). Smith is, therefore, not entitled to a downward adjustment under U.S.S.G. § 4C1.1.

The U.S. Probation Office calculated Smith's criminal history score to be one and thus he is category I, which is not disputed. PSR ¶ 52. Accordingly, based on the government's calculation of the defendant's total adjusted offense level as 16, Smith's Guidelines range is 21 to 27 months' imprisonment. The government recommends that the court sentence Smith to 24 months incarceration, the midpoint of his calculated guidelines range.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration at the midpoint of Smith's calculated guidelines range.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Smith's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Smith ascended the West Front of the Capitol into the scene of an ongoing riot. On the Upper West Terrace, he watched as a group of rioters forcefully smashed through a door and fought with police to breach the Capitol through the Parliamentarian Door. He then entered the building through this same door, while covering his face against the chemical irritants in the air in the Brumidi Corridor. Inside the Capitol, he helped to break through a historic wooden door that was part of the original construction of the Senate Wing of the Capitol in the 1850s. All told, he did more than $21,000 in damage to the Capitol.

In addition to the monetary and physical damage that he caused to the building, Smith's conduct also had very real consequences for the officers who were attempting to control the riot inside the Brumidi Corridor. The office spaces to S-131 are configured in such a way that, by entering through the door that Smith broke down, a person could turn right inside of S-131, move north for the length of the Brumidi Corridor, and then pass through a door that deposits them into the hallway beyond the Brumidi Corridor. In the context of the riot, this allowed rioters to circumvent the line of police in the hallway and move beyond the point where the police had stopped the flow of rioters. Because of Smith's conduct, rioters were able to bypass and surround these officers, which opened these officers to a potential rear assault. Officers had to divert their limited resources from holding the rioters back inside the corridor to clearing the office space inside S-131. Smith's actions, therefore, opened up a new front of the riot that had immediate

safety and strategic consequences for the police inside the Capitol who were trying to control the riot and protect the democratic process taking place that day. The nature and circumstances of Smith's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 24 months' incarceration.

### B.  The History and Characteristics of the Defendant

Smith is a 48-year-old man who owns a contracting and home remodeling business in Fleming Island, Florida. He has owned this contracting and remodeling company since 2005. PSR ¶ 99. In his interview with the Probation Office, Smith described his childhood as "great," *id.* at ¶ 71, and said that he still has the support his family, *id.* at ¶ 72. Smith has one prior conviction. In July 2024, he pled no contest to False Representation as a Licensed Contractor in Duval County Circuit Court in Florida. PSR ¶ 51. As a result of his no contest plea, an adjudication of guilt was withheld, but he was ordered to pay $7,865 in restitution to the victims. *Id.*

Yet, despite this background with a supportive family and long-term employment, Smith readily and eagerly joined a riot because his candidate of choice had lost. During that riot, despite his many years of working in construction and remodeling as well as the incumbent knowledge about the resources required to replace a door, he worked with other rioters to break down a historic door. As the evidence presented at trial established, Smith also misled the FBI in his initial interview with them in September 2021. Smith, despite a history of abiding by the law and a generally positive upbringing and background, choose to participate in an act of political violence by destroying a literal piece of our nation's seat of government. Rather than coming clean about his actions that day, Smith lied to the FBI about the nature of his destructive and violent act in an effort to evade the consequences of his actions. Smith's history and characteristics, therefore,

support a sentence of 24 months.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Smith's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.  The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. In the Northwest Courtyard, Smith was subjected to the effects of chemical irritants and watched as a riot unfolded around him. Yet, he did not leave the area or make any effort to separate himself from the mob. Instead, Smith stood at the base of the stairs that led to the Parliamentarian Door and watched as a group of rioters smashed through the glass panes of that door and fought with police to breach the building. Still, Smith still refused to leave. Instead, he mounted the steps to the Parliamentarian Door and bounded up into the Capitol. Once inside, and despite seeing additional clear signs of the unfolding riot both

---

[6]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

before and after he entered, Smith joined the violence and helped smash down a historic door to help rioters navigate around the hallway where police sought to hold the rioters back. That Smith chose to break through this door even with his personal knowledge of the costs involved with replacing a door is further evidence of the unique need for specific deterrence in this case. Finally, even after learning that video footage captured his destructive conduct at the Capitol, Smith lied to the FBI in an effort to evade responsibility for his actions. On January 6, 2021, Smith chose to do the wrong thing and even a scene of shocking violence could not deter him from his course or engaging in destruction of property. This factors thus weighs heavily in favor of a sentence at the mid-point of the guidelines.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."

*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] Notably, of the more than 1,100 January 6 cases to have gone to sentencing at this point approximately twenty have pled to or been convicted at trial of violations of 18 U.S.C. § 1361. Several of those who have been convicted of 18 U.S.C. § 1361 were convicted as part of complex conspiracy cases, often involving charges of seditious conspiracy. *See United States v. Rhodes et al.*, 21-cr-28 (APM) and *United v. Ethan Nordean et al.*, 21-cr-175 (TJK). The defendants in these complex conspiracy cases are inapposite as comparators in this case. Of the remaining cases, nearly half involved defendants breaking windows during the riot, but many were also convicted of other felonies. *See United States v. Dylan Cronin*, 22-cr-233 (ABJ) (defendant sentenced to three months for kicking in a window near the Senate Wing Door); *United States v. Shane Jenkins*, 21-cr-245 (APM) (defendant with a criminal history category of VI who was also convicted of 18 U.S.C. § 111(a) and (b) was sentenced to 83 months for breaking a window near the Lower West Terrace

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

tunnel with a hatchet); *United States v. Rachel Powell*, 21-cr-179 (RCL) (defendant sentenced to 57 months for smashing a window with an ice axe and was also convicted of 18 U.S.C. §§ 1512(c)(2), 231(a)(3), and 1752(a)(1) and (b)(1)(A)); *United States v. Leo Bozell*, 21-cr-216 (JDB) (defendant who broke three windows and was also convicted of 18 U.S.C. §§ 111(a)(1), 231(a)(3), and 1512(c)(2) sentenced to 45 months of incarceration for breaking three windows during the initial breach of the Capitol); *United States v. Allan Jennings*, 24-cr-203 (RBW) (defendant who was also convicted of 18 U.S.C. § 231(a)(3) sentenced to 12 months for using a pair of special "glass breaking" scissors to smash through the doors in the Lower West Terrace tunnel and); *United States v. Winegart*, 22-cr-301 (CJN) (defendant sentenced to four months for a misdemeanor conviction of 18 U.S.C. § 1361 for breaking a window); *United States v. Hunter Ehmke*, 21-cr-29 (TSC) (21-year-old defendant who kicked and punched out three windows near the Rotunda on the East Side of the Capitol sentenced to four months); *United States v. Nicholas Rodean*, 21-cr-57 (TNM) (defendant with a well-documented history of severe Asperger's Syndrome sentenced to five years of probation for smashing several window panes with flagpoles and metal objects); *United States v. Troy Faulkner*, 21-cr-126 (BAH) (defendant kicked out several exterior windows sentenced to five months following a plea); *United States v. Christopher Grider*, 21-cr-22 (CKK) (defendant who was also convicted of 18 U.S.C. §§ 231(a)(3) and 1512(c)(2) sentenced to 83 months for handing a helmet to another and encouraging him to smash through an interior window with congress members evacuating on the other side). Smith, who did not use a weapon to break down the door, lacks both another felony conviction or one of the serious mitigating factors, such as being of a very young age or a having a well-documented mental condition, that has been at play in many of these cases. However, considering the historic nature

of the door he broke down, his conduct was worse than breaking windows and his sentence should be appropriately more severe than those individuals who only broke windows. Smith's crimes make him unique among the many individuals who have been convicted of 18 U.S.C. § 1361.

Three of the other defendants who broke down the door with Smith have already been sentenced. *See United States v. Kevin Clardy*, 23-cr-294 (RCL) (defendant pled to 18 U.S.C. § 1752(a)(2) and was sentenced sixty days incarceration with a government recommendation of ninety days); *United States v. Thomas Riddle*, 23-cr-279 (RCL) (same); *United States v. Isaiah Farnsworth*, 23-cr-4 (APM) (defendant with a significant criminal history pled to a felony violation of 18 U.S.C. § 1361 and was sentenced to three months incarceration). Smith's conduct was worse than each of these three defendants and their guidelines calculations are also distinguishable. First, Smith joined the push at the door to S-131 before Clardy and Riddle and he was, therefore, closer to the door than both these individuals and involved in more pushes against the door. Second, while Farnsworth did join the pushing before Smith did, his pushes were more sporadic and, at least three times, he stepped away from the door to yell while the others were pushing against it. Third, each of these defendants pled guilty and therefore received a reduction for acceptance of responsibility. But all three of these defendants were sentenced at or near the midpoint of their calculated guidelines. Smith should, therefore, receive a sentence of 24 months, which is also the midpoint of his calculated guidelines.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

28

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664). Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*,

926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because Smith engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Smith responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to Smith's individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Smith to pay $21,191 in restitution for his convictions. This amount fairly reflects his role in the offense and the damages resulting from his conduct. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  FINE

Smith's convictions subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *see* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Smith's financial assets set forth in the PSR suggest that the he is unable, and is unlikely to become able, to pay a fine.[10]

---

[10] In the ordinary course, the government would ask for a fine under these facts. However, after reviewing Smith's financial situation, PSR ¶¶ 103-114, the government believes that requesting a fine in this case would be an exercise in futility. Smith has not filed his taxes in three years and owes a tremendous amount of money in credit card debt. *Id.* at ¶¶ 99, 103. He also has both a negative monthly cash flow and a negative net worth. *Id.* at ¶ 103. This is in addition to the tens of thousands of dollars in apparently unpaid civil judgments against him from various financial institutions and creditors. *Id.* at ¶ 110. Therefore, in its discretion, the government is choosing not to request a fine in this case.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months of incarceration, thirty-six months of supervised release, $21,191 in restitution, and a $230 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
601 D Street NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

JOHN OXENREITER
Assistant United States Attorney
New York Bar No. 5511697
601 D Street NW
Washington, D.C. 20530
John.Oxenreiter@usdoj.gov