IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MARCUS SMITH<br><br>　　　　Defendant. | Case No. 1:24-cr-00042-DLF<br><br>**REVISED**<br>**SENTENCING MEMORANDUM &**<br>**MOTION FOR VARIANCE** |

　　　　MARCUS SMITH ("Mr. Smith"), by and through his counsel of record, Kevin A. Tate, Litigation Resource Counsel and Benjamin Nemec, Assistant Federal Defenders, District of Nevada, pursuant to Fed. R. Crim. P. 32 of the hereby files his *Revised Sentencing Memorandum*.[1]

　　**I.　　The Court Should Sustain Mr. Smith's Objections to the Loss Amount in Connection with the Door Repair is Zero**

　　　　Mr. Smith objects to the unproven assertion that the *repair cost* door for Capital Room S-131 that he helped damage cost $21,191.00. This assertion was factually unsupported at trial, was based on mere speculation in contravention to the requirements of U.S.S.G. § 2B1.1

　　　　Moreover, the cumulative *loss amount resulting from damage to the US Capital* in the amount of $2,923,080.05 has no factual basis and does not adhere to the requirements of U.S.S.G. § 2B1.1. There is simply insufficient information to determine the method and factors used to calculate the loss amount.

---

[1] This revised pleading adds and incorporates recent letters received many since the filing of Mr. Smith's Sentencing Memorandum, including on the date of this filing which are incorporated here on page 10 section (II) (A) (2) (d).

## II. THE 4 LEVEL ADJUSTMENT TO BASE OFFENSE LEVEL AT PSR WILL RESULT IN AN ERRONEOUS ADJUSTED OFFENSE LEVEL

Without the required legal or factual support, the government erroneously concluded that the loss amount related to the damage to Capital Door S-131 was $21,191.00 resulting in an **improper 4 level adjustment** to Mr. Smith's applicable Base Offense Level of **6** ("BOL") resulting in an incorrect Adjusted Offense Level ("AOL") of **10**. PSR ¶ 36. Should the Court follow this recommendation, that would result in unconstitutional sentencing error.

The government fails to establish an *actual* or *intended* loss amount. The Court must not rely on the government witness Capital Architect Mr. McIntyre's unverified, and factually unsupported testimony that the "ultimate cost" of replacing door S-131 was $21,191.00.

To the contrary, Mr. McIntyre's testimony confirmed that the materials for the door repair were "donated to by the Forestry Service" who maintained a supply of various woods from its own excavations of U.S. Forest lands. Mr. McIntyre further testified that the repairs were performed by salaried U.S. Capital maintenance staff whose essential job is to make repairs around the Capital. Consequently, neither the U.S. Capital or the Architects office suffered an *actual* or *intended loss* that would support a 4 Level adjustment to Mr. Smith' otherwise applicable BOL.

Mr. Smith's correct BOL in relation to his conviction on Count One a violation of 18 U.S.C. § 1361 (Destruction of Government Property) is a **BOL of 6**.

### A. Mr. Smith's Convictions on Counts Two, Three, and Four in violation 18 U.S.C. § 1752 (Disorderly and Disruptive Conduct in Restricted Building or Grounds).

The Draft PSR erroneously applies guideline §2A2.4 (Obstructing or Impeding Officers) applying a **BOL of 10**. Mr. Smith was charged, and the evidence adduced at trial for Counts Two, Three, and Four was:

>Count Two *Entered and Remained in Restricted Building or Grounds.*
>Count Three *Disorderly, Disruptive in a Restricted Building or Grounds.*
>Count Four *Engaging in Physical Violence in a Restricted Building or Grounds.*

Those offenses all alleged *interference with Congress while the Vice President was visiting the Capital*. The record is devoid of any allegation or evidence regarding Mr. Smith Obstructing or Impeding Officers that would support applying the § 2A2.4 guideline.

The correct guideline to be applied for Mr. Smith's convictions on Counts Two, Three, and Four for violating the provisions of 18 U.S.C. § 1752 is U.S.S.G. §2B2.3 (Trespass Offenses). The **BOL for this guideline is 4**. Consistent with the charges and facts of Mr. Smith's case, this guideline applies a 2 Level adjustment if the offense involves a "secure government facility." *See* §2B2.3 (b) (1) (A) (i). Accordingly, Mr. Smith's appropriate Adjusted Base Offense Level ("AOL") for Counts Two, Three, and Four is an **AOL of 6**.

The PSR applies two erroneous **AOL of 10** for two groups of offenses pursuant to U.S.S.G. § 3D1.4 (a) (b) and (c). The correct AOL for Group 1 (Count One) is **6**. The correct AOL for Group 2 (Counts Two, Three, and Four) is also **6**.

Group 1 is counted a 1 unit, and Group 2 would also add an additional unit for a total of 2 Units. The combined AOL is **8**.

B.     **Mr. Smith has Zero Criminal History Points**

The Draft PSR assigns Mr. Smith 1 Criminal History point for the purported offense of "False Representation as a Licensed Contractor in Duval County, Florida." PSR ¶ 51. Mr. Smith denies that such conviction, if true, is countable under the sentencing guidelines. Importantly, the Draft PSR conforms that no records have been received and reviewed to determine whether this offense should be considered for criminal history purposes.

The Supreme Court's decision in *Descamps v. United States*, 133 S. Ct. 2276 (2013), rejected the "modified categorical approach," which had permitted wide-ranging use of

*Shepard*-approved documents "to determine the factual basis of the conviction." *Id*. at 2283. In doing so, the Court explained that sentencing courts must "focus on the elements, rather than the facts, of a crime." *Id.* at 2285.

One reason for this elements-based approach, the Court said, is that "it avoids the Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that properly belong to juries." *Id.* at 2287. Specifically, the Supreme Court condemned the Ninth Circuit's fact-based approach because it "authorizes the court to try to discern what a trial showed, or a plea proceeding revealed, about the defendant's underlying conduct." *Id.* at 2288. That approach, the Court held, runs afoul of the Sixth Amendment because the only facts necessarily found by the prior conviction "are those constituting elements of the offense—as distinct from amplifying but legally extraneous circumstances." *Id.* And, as a practical matter, the Court pointed out that "the statements of fact in [*Shepard*-approved documents] may be downright wrong" because a defendant "often has little incentive to contest facts.

Here, because the Court has not received and reviewed any *Shepard*-approved documents, it cannot possibly be concluded that the *specious* offense qualifies for a Criminal History offense. Nonetheless, even if that offense qualified for 1 point, Mr. Smith's Criminal History Category would still be I.

## II.   18 U.S.C. § 3553 Factors Demonstrate that a Variance is Warranted in Mr. Smith's Case.

In imposing a just sentence, this Court should consider the significant punishment resulting from the collateral consequences of the Defendant's felony conviction. As noted in In the PSR Mr. Smith has no prior felony convictions. Just based on the instant convictions, Mr. Smith will face an overwhelming number of collateral consequences.

A recent congressional report by the United States Government Accountability Office (GAO) demonstrates there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), available at http://www.gao.gov/products/GAO-17-691.pdf.. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id*.

Recognizing the effect of collateral consequences of a felony conviction, one district court has emphasized the need for federal judges to account for such an impact at sentencing *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016) (Block, J.) (varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). *Nesbeth* concluded that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence." *Id*.; *see also* Jeremy Travis, *Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* (Marc Mauer & Meda Chesney-Lind eds., 2002). In granting a variance in *Nesbeth*, the court asserted that the collateral effects of a criminal conviction can be "devastating" to a defendant. *Nesbeth*, 2016 WL 3022073, at *1.

A myriad of laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.' *Id*. (citing Michelle Alexander, *The New Jim Crow* (2010)). As

Judge Block concluded, "[t]oday, the collateral consequences of criminal convictions form a new civil death." *Id*. at *3. This new civil death for a convicted felon significantly affects their rights and prospects. *Id*. (citing *The New Jim Crow* at 141). As *Nesbeth* establishes, the civil death that Mr. Smith now faces because of his conviction constitutes significant punishment. *See also* Wayne A. Logan, *Informal Collateral Consequences,* 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave").

  **A.**  **The Need to Afford Adequate Deterrence to Criminal Conduct**

This section addresses whether a long prison sentence will accomplish the § 3553 factor of deterrence. Such an examination requires an analysis of both general and specific deterrence.

  **1.**  **General Deterrence**

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015), available at https://www.brennancenter.org/publication/what-caused-

crime-decline. The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?* 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes:

> There is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent. *Id*. at 1031.

The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

### 2. Specific Deterrence

Having established that prison sentences, regardless of length, do not affect general deterrence, this section demonstrates that the factor of specific deterrence also supports Mr. Smith's request for a variance. The first part of this section focuses on studies establishing that incarceration does not affect recidivism. Besides this general empirical evidence, the second part asserts that Mr. Smith's history and characteristics prove that he will never commit another crime.

a.      **The relationship between incarceration and recidivism**

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

The 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. First, incarceration has a negligible impact on crime prevention. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016); *see also* Vera Instit. of Justice, *Overview of The Prison Paradox: More Incarceration Will Not Make Us Safer* (July 2017) (concluding that research shows a "weak relationship between incarceration and crime reduction and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration").[2]

Instead, longer prison sentences may lead to greater risks of recidivism. *See id*. There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties, and exposing less serious offenders to older more serious offenders - leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy

---

[2] The United States Sentencing Commission has determined that "[t]here is no correlation between recidivism and guidelines' offense level. . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).

589 (2007).

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release. National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887). ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance")*.*

### b.     Mr. Smith is a Low risk of Recidivism

Mr. Smith also has an exceptionally low risk of recidivism. He is forty-eight (48) years old, a first offender, employed throughout his adult life, married, and has minor children to support. For offenders in Criminal History Category (CHC) I, the recidivism rate is 13.8%.[3] Where an offender was legally married at the time of sentencing, the rate is 9.8%.[4] For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history.[5]

Mr. Smith was found guilty of essentially *civil disturbance offense s and contributing to damage of government property.* He is Criminal History Category I. For all Category I defendants convicted, the recidivism rate is just 9.3%, the lowest of any offense category.[6]

---

[3] *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at Exh. 2 at 21 (May 2004).

[4] *See id.* at Exh. 10 at 29.

[5] *Id.*

[6] *See id.* at Exh. 11 at 30.

Defendants, like Mr. Smith, with zero criminal history points[7] have a rate of recidivism half that of offenders with one criminal history point.[8]

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Smith, this Court should consider the statistically low risk of recidivism presented by him. *United States v. Urbina*, slip op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties).

      **c.**      **Downward Variance will prevent unwarranted sentencing Disparity**

Should President Trump pardon all or a large portion of January 6th participants, *anyone not already sentenced will receive no custodial time*. That means, should this Court choose to sentence Mr. Smith to a custodial sentence on January 17, 2025, it will unknowingly create a sentencing disparity with those who are pardoned without a sentence. The sentence imposed must avoid unwarranted sentence disparities among defendants found guilty of similar conduct. 18 U.S.C. § 3553(a)(6).

      **d.**      **The Court should review and consider the twenty (20) attached sentencing letters.**

Mr. Smith has considerable tangible characteristics that warrant variance to a probationary sentence, despite the Court's ruling on his advisory guideline objections. The people that know Mr. Smith best, describe his conduct as *aberrant*, and in stark contrast to his lifelong—law abiding—community and family-oriented life. For instance, the letter writers note his community service, devotion to family and church, and expressed remorse. *See Exhibit A* (sentencing letters).

---

[7] PSR ¶ 169.

[8] *See* U.S. Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004).

## CONCLUSION

    Mr. Smith respectfully requests this Court vary downward and sentence him to an aggregate term of Probation based on: (1) Mr. Smith's personal history; (2) absence of criminal history; (3) low risk of recidivism; and (4) strong support of family and friends. A sentence to a term of Probation is sufficient, but not greater than necessary to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

    Respectfully submitted,

*/s/ Kevin A. Tate*
Kevin A. Tate
Litigation Resource Counsel-AFD
Nevada State Bar No: 8987
Benjamin Nemec
Assistant Federal Defender
Nevada State Bar No. 14591
411 East Bonneville Avenue, Suite 250
Las Vegas, Nevada 89101

**Counsel for Marcus Smith**

**Dated**:  January 10, 2025.